IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TRADEWAYS, LTD.
    *Plaintiff*,

v.

THE UNITED STATES DEPARTMENT
OF THE TREASURY, *et al.*,
    *Defendants*.

Civil Action No. ELH-20-1324

**MEMORANDUM OPINION**

This case concerns the validity of an interim final rule promulgated by the United States Small Business Administration ("SBA") in connection with the Paycheck Protection Program ("PPP"), a multibillion dollar federal loan program designed to provide emergency relief to small businesses in the midst of the COVID-19 pandemic. The rule, which establishes eligibility criteria for participation in the PPP, disqualifies potential borrowers if the borrower or its owner is a debtor in bankruptcy.

Plaintiff Tradeways Ltd. ("Tradeways" or the "Company") applied for, but was denied, a PPP loan of $86,000 because its owner is in Chapter 11 bankruptcy. As a result, the Company filed suit against several defendants: the SBA; Jovita Carranza, the Administrator of the SBA; the United States Department of the Treasury; and Steven Mnuchin, the Secretary of the Treasury (collectively, the "Government"). ECF 1 (the "Complaint"). Tradeways alleges that the SBA's rule violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), and the Bankruptcy Code's antidiscrimination statute, 11 U.S.C. § 525.

Along with the suit, plaintiff filed an "Emergency Motion For A Temporary Restraining Order And Preliminary Injunction." ECF 2. It is supported by a memorandum of law (ECF 2-1) (collectively, the "Motion") and the Affidavit of Tradeway's owner, Joseph Gorski. ECF 2-3.

Tradeways asks the Court, *inter alia*, to enjoin defendants from denying a PPP loan to Tradeways due to Mr. Gorski's status as a Chapter 11 debtor and to set aside $86,000 in PPP funding.  ECF 2 at 2.

On June 1, 2020, the Court held an emergency telephone conference with counsel for both sides.  *See* ECF 9.  At that time, counsel agreed to proceed on the request for a preliminary injunction, rather than the request for a temporary restraining order.  *Id.*  Thereafter, defendants filed an opposition to the Motion (ECF 12), along with six exhibits.  ECF 12-1 to ECF 12-6. Plaintiff has replied.  ECF 15.

Due to the COVID-19 pandemic, the Court held a hearing by videoconference on June 23, 2020, at which argument was presented.  For the reasons that follow, I shall deny the Motion.

## I.   Background

### A.  The SBA

Over fifty years ago, through the Small Business Administration Act, Congress established the SBA to "aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns," in order to preserve the system of free competitive enterprise that is "essential" to the nation's economic wellbeing and security.  Pub. L. 83-163, 67 Stat. 232 (1953) (codified at 15 U.S.C. § 631(a)); *see also* 15 U.S.C. § 633(a) (establishing the SBA).  To effectuate these goals, Congress gave the SBA "extraordinarily broad powers," including "that of lending money to small businesses whenever they could not get necessary loans on reasonable terms from private lenders." *Small Bus. Admin. v. McClellan*, 364 U.S. 446, 447 (1960).

The SBA's authority to issue loans—whether in the form of direct loans, joint loans with lenders, or loan guarantees—flows from § 7(a) of the Small Business Act, which is titled "Loans to small business concerns; allowable purposes; qualified business; restrictions and limitations."

Pub. L. 85-563, § 7, 72 Stat. 384 (1958) (codified at 15 U.S.C. § 636).  Under § 7(a), the SBA is "empowered," subject to certain qualifications, "to make loans to any qualified small business concern," which "may be made either directly or in cooperation with banks or other financial institutions through agreements to participate on an immediate or deferred (guaranteed) basis." 15 U.S.C. § 636(a).  Among other restrictions imposed on loans issued or guaranteed by the SBA, § 7(a) provides that such loans "shall be of such sound value or so secured as reasonably to assure repayment . . . ."  *Id.* § 636(a)(6).

In order to ensure that the SBA could respond swiftly to economic developments, Congress placed the agency under the management of a single Administrator.  *Id.* § 633(a), (b)(1).  Further, Congress delegated authority to the Administrator to "make such rules and regulations as [she] deems necessary to carry out the authority vested in [her]," and "take any and all actions" that she "determines . . . are necessary or desirable in making, servicing, compromising, modifying, liquidating, or otherwise dealing with or realizing on loans made under" the Small Business Administration Act.  *Id.* § 634(b)(6), (b)(7).

## B.  COVID-19, the CARES Act, and the PPP[1]

The COVID-19 pandemic is, without dispute, the worst public health crisis the country has experienced since 1918.  The novel coronavirus is a highly contagious and sometimes fatal respiratory illness. [2]  The virus first appeared in Wuhan, China in December 2019; in a matter of

---

[1] I may take judicial notice of publicly available facts.  *See* Fed. R. Evid. 201.

[2] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

months, COVID-19 spread to every corner of the globe.[3]  On March 12, 2020, the World Health Organization declared COVID-19 a global pandemic.  *See* WHO Director-General's opening remarks at the mission briefing on COVID-19, WORLD HEALTH ORG. (March 12, 2020), https://bit.ly/2XWdodD. The next day, President Trump declared a national emergency.  *See* The White House, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), https://bit.ly/3flFu8i.

There is currently no vaccine or cure for COVID-19.  Therefore, the Centers for Disease and Control has implored citizens to practice "social distancing" in order to abate the spread of the virus.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba.  To that end, nearly every state issued mandatory stay-at-home orders, directing residents to remain at home except to conduct essential activities.  *See Sarah Mervosh et al.*, *See Which States Are Reopening and Which Are Still Shut Down*, N.Y. TIMES (May 15, 2020), https://nyti.ms/2Z6Fm7F.  As a result, life as we know it came to a halt; schools, restaurants, bars, movie theaters, shopping malls, retail stores, houses of worship, and gyms all shuttered for a significant period of time.

Social distancing measures were needed to thwart the spread of the virus and to "flatten" the epidemiological curve.  But, these measures had tremendous economic consequences.  Personal consumption in March 2020 plunged by a record 7.5 percent.  *See Personal Income and*

---

[3] As of June 23, 2020, the coronavirus has infected over 9 million individuals world-wide and caused over 470,000 deaths.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed June 23, 2020).  Fatality rates increase with age and underlying health conditions, such as cardiovascular disease, respiratory disease, diabetes, and immune compromise.  *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

*Outlays: March 2020*, U.S. Bureau of Econ. Analysis (Apr. 30, 2020 8:30), https://bit.ly/3d8wUZ2. In the month of April 2020 alone, more than 20 million Americans lost their jobs, driving the unemployment rate to 14.7 percent, the largest single-month increase ever recorded. *See Economic News Release*, U.S. Bureau of Lab. Stat. (May 8, 2020), https://bit.ly/2UGiOYr. Notably, these losses reached people from all stations of life: the leisure and hospitality industry lost 7.7 million jobs (nearly half the industry), while the education and health services industry, the professional and business services industry, and the retail trade industry each shed more than 2 million jobs. *Id.*

On March 27, 2020, President Trump signed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. 116-136, 134 Stat. 281 (2020), a $2.2 trillion stimulus package, in order alleviate the incredible economic devastation wrought by the COVID-19 pandemic. Among its many purposes, the CARES Act was designed to preserve American jobs. *See, e.g.,* Cong. Rec. S1975 (daily ed. Mar. 24, 2020) (statement of Sen. McConnell) (identifying providing assistance to "Main Street small businesses" as a "key objective" of the CARES Act); Cong. Rec. E343 (daily ed. Mar. 31, 2020) (statement of Rep. Eshoo) (describing the PPP as one of "four major pillars" of the CARES Act). In particular, the CARES Act creates two distinct programs to encourage businesses to keep employees on the payroll.

First, Congress acted to bolster mid-size and large businesses. Section 4003 of Title IV of the CARES Act, entitled "Emergency Relief and Taxpayer Protection," directs the Treasury Department to disburse $454 billion to private lenders to make direct loans to businesses that have between 500 and 10,000 employees. Pub. L. 116-136, §§ 4003, 1107 (to be codified at 15 U.S.C. § 9042). To receive favorable loan terms, a borrower must agree to retain or restore ninety percent of its workforce. *See* 15 U.S.C. § 9042(c)(3)(D)(i)(lll). Of relevance here, the CARES Act

expressly provides that a borrower seeking a loan under this program must certify that it "is not a debtor in a bankruptcy proceeding." *Id.* § 9042(c)(3)(D)(i)(V).

Second, Congress sought to provide emergency capital to small businesses. Section 1102 of Title I of the CARES Act, which is named the "Paycheck Protection Program," provides an aggregate $649 billion in loans to small businesses. Pub. L. 116-136, §§ 1102, 1107 (to be codified at 15 U.S.C. § 636).[4] Whereas the lending program for mid-size businesses is housed in a freestanding section of the United States Code, Congress placed the PPP within 15 U.S.C. § 636(a). That is the statutory provision created by § 7(a) of the Small Business Act, and it concerns the SBA's lending authority. *See* Pub. L. 116-136, § 1102(a).

Under the PPP, an "eligible recipient" can receive a "covered loan" in an amount up to two and a half times its average monthly payroll. 15 U.S.C. § 636(a)(36)(E). An "eligible recipient" is defined as "an individual or entity that is eligible to receive a covered loan." *Id.* § 636(a)(36)(A)(iv). The CARES Act defines a "'covered loan'" as "a loan made under [the PPP] during the covered period," *i.e.*, between February 15, 2020 and June 30, 2020. *Id.* § 636(a)(36)(A)(ii)-(iii).

The CARES Act provides that borrowers may "use the proceeds of the covered loan" for payroll costs; group health benefits and insurance premiums; and mortgage interest, rent, and utilities. *Id.* § 636(a)(36)(F)(i). Depending on how the business spends the proceeds, the loan may

---

[4] Initially, the CARES Act allocated $349 billion to guarantee PPP loans. Pub. L. 116-136, § 1102(b)(1). On April 16, 2020, the SBA announced that the PPP was closed to new applications. Eight days later, on April 24, 2020, Congress appropriated an additional $310 billion for loan guarantees under the PPP. *See* The Paycheck Protection and Health Care Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620 (2020). And, on June 5, 2020, Congress passed a law expanding forgiveness requirements and extending the PPP through the end of 2020. *See* Paycheck Protection Program Flexibility Act of 2020, H.R. 7010, Pub. L. No. 116-142, __ Stat. __ (2020).

be forgiven up to the full principal amount.  *Id.* § 9005(b).[5]  Further, the CARES Act requires the

SBA to remit to the lender the amount forgiven, plus interest.  *Id.* § 9005(c)(3).

Regarding eligibility criteria, the CARES Act specifies: "Except as otherwise provided in

this paragraph, the Administrator may guarantee covered loans under the same terms, conditions,

and processes as a loan made under this subsection."  *Id.* § 636(a)(36)(B).  And, the CARES Act

provides, *id.* § 636(a)(36)(D)(i) (emphasis in original):

**(D) Increased eligibility for certain small businesses and organizations**

**(i) In general**

During the covered period, in addition to small business concerns, any business
concern, nonprofit organization, veterans organization, or Tribal business concern
described in section 657a(b)(2)(C) of this title shall be eligible to receive a covered
loan if the business concern, nonprofit organization, veterans organization, or
Tribal business concern employs not more than the greater of—

(I) 500 employees; or

(II) if applicable, the size standard in number of employees established by
the Administration for the industry in which the business concern, nonprofit
organization, veterans organization, or Tribal business concern operates.

In addition, the CARES Act permits independent contractor and certain self-employed individuals

to receive PPP loans.  *Id.* § 636(a)(36)(D)(ii)(l).

The CARES Act also streamlines the underwriting process of PPP loans.  Besides

satisfying the eligibility criteria, an applicant seeking to participate in the PPP must certify that (1)

"the uncertainty of current economic conditions makes necessary the loan request to support the

ongoing operations of the eligible recipient"; (2) it will use the PPP funds for covered expenses;

and (3) it has not previously received a PPP loan and will not do so again before December 31,

---

[5] The CARES Act provides that no more than 25 percent of the loan forgiveness amount
may be spent on non-payroll expenses.  *See* 15 U.S.C. § 9005(d)(3)(A).

7

2020. *Id.* § 636(a)(36)(G)(i)(l)-(lV). Further, the PPP provides that lenders "shall consider" whether the borrower (1) "was in operation on February 15, 2020," and (2) either "had employees for whom the borrower paid salaries and payroll taxes," or "paid independent contractors." *Id.* § 636(a)(36)(F)(ii)(ll). Notably, unlike the loan program for mid-size businesses, the CARES Act does not address whether bankruptcy debtors are eligible to receive PPP funds.

### C. SBA's Interim Rule

The CARES Act authorizes the SBA to issue regulations implementing the PPP without adhering to the notice-and-comment process that typically governs agency rulemaking. *See* Pub. L. 116-136, § 1114. Specifically, the CARES Act provides that no later than 15 days after its enactment, the SBA "shall issue regulations to carry out this title and the amendments made by this title without regard to the notice requirements under [the APA]." 15 U.S.C. § 9012.

Pursuant to that grant of authority, the SBA promulgated a First Interim Final Rule concerning the PPP on April 15, 2020. *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811-17 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt. 120). In an effort to expedite the application process, the SBA's First Interim Final Rule clarified that the SBA's normal underwriting guidelines did not apply to PPP loans. *See id.* at 20,812 (excusing lenders issuing PPP loans from the underwiring requirements contained in 13 C.F.R. § 120.150); *see also id.* at 20,815 (delineating lenders' obligations under the PPP). Instead, in a section titled "What Do Lenders Have to Do in Terms of Loan Underwriting," the First Interim Final Rule provides that lenders need only confirm receipt of borrower certifications, verify information related to payroll requirements, and "review[] the 'Paycheck Protection Application Form.'" *Id.* at 20,815.

Along with the First Interim Final Rule, the SBA published "SBA Form 2483," the "Paycheck Protection Application Form" (the "PPP Application").  *See* ECF 12-5 (SBA Form 2483).  The first question on the PPP Application is as follows, *id.*:

> Is the Applicant or any owner of the Applicant presently suspended, debarred, proposed for debarment, declared ineligible, voluntarily excluded from participation in this transaction by any Federal department or agency, or presently involved in any bankruptcy?

The PPP Application instructs, *id.* (emphasis in original): "*If questions (1) or (2) below are answered 'Yes,' the loan will not be approved*."

On April 24, 2020, concurrent with Congress's extension of additional funding for the PPP, the SBA issued an operative Fourth Interim Final Rule (the "IFR"), which it published in the Federal Register on April 28, 2020.  *See* Business Loan Program Temporary Changes; Paycheck Protection Program-Requirements-Promissory Notes, Authorizations, Affiliation, and Eligibility, 85 Fed. Reg. 23,450-52 (Apr. 28, 2020).[6]  The IFR provides additional information regarding a number of eligibility requirements, including the bankruptcy exclusion set forth in the PPP Application.  The IFR provides, in part, *id.* at 23,451:

### 4. Eligibility of Businesses Presently Involved in Bankruptcy Proceeding

Will I be approved for a PPP loan if my business is in bankruptcy?

No. If the applicant or the owner of the applicant is the debtor in a bankruptcy proceeding, either at the time it submits the application or at any time before the loan is disbursed, the applicant is ineligible to receive a PPP loan. If the applicant or the owner of the applicant becomes the debtor in a bankruptcy proceeding after submitting a PPP application but before the loan is disbursed, it is the applicant's obligation to notify the lender and request cancellation of the application. Failure

---

[6] The SBA also issued second and third interim final rules, neither of which is relevant to this suit.  *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,817 (Apr. 15, 2020); Business Loan Program Temporary Changes; Paycheck Protection Program—Additional Eligibility Criteria and Requirements for Certain Pledges of Loans, 85 Fed. Reg. 21,747 (Apr. 20, 2020).

by the applicant to do so will be regarded as a use of PPP funds for unauthorized purposes.

The Administrator, in consultation with the Secretary [of Commerce], determined that providing PPP loans to debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds or non-repayment of unforgiven loans. In addition, the Bankruptcy Code does not require any person to make a loan or a financial accommodation to a debtor in bankruptcy. The Borrower Application Form for PPP loans (SBA Form 2483), which reflects this restriction in the form of a borrower certification, is a loan program requirement. Lenders may rely on an applicant's representation concerning the applicant's or an owner of the applicant's involvement in a bankruptcy proceeding.

### D.  Tradeways

Tradeways, a Delaware corporation based in Annapolis, Maryland, markets itself as "a recognized leader in the international Nuclear, Biological, and Chemical (NBC) Defense Community, specializing in the field of NBC Defense equipment by allied governmental organizations."  *Profile,* TRADEWAYS, LTD, http://www.tradewaysusa.com/eng/profile.cfm (last accessed June 14, 2020); *see* ECF 1, ¶¶ 1-2.  According to the Company's sole owner, Joseph Gorski, Tradeways's "primary source of revenue is earned through fulfilling export contracts with businesses and governments based in multiple foreign countries," including South Korea, Italy, Sweden, and the United Arab Emirates.  ECF 2-2 (Gorski affidavit), ¶ 3.  Thus, Tradeways's operations rely heavily on foreign travel and in-person meetings with customer representatives. *Id.* ¶ 4.  At the time the suit was filed, the Company employed six individuals.  *Id.* ¶ 6.

On February 4, 2019, Mr. Gorski filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Maryland.  *Id.* at ¶ 10; *see In re Joseph Gorski*, 19-11500 (Bankr. D. Md.).  The Company avers that Mr. Gorski's bankruptcy is unrelated to the operation of Tradeways and pertains only to Mr. Gorski's personal assets and liabilities.  ECF 1, ¶ 24; *see also* ECF 2-2, ¶ 10 (Mr. Gorski attesting that his bankruptcy proceedings are solely personal).  Mr. Gorski's bankruptcy is presently pending before the U.S. Bankruptcy Court.  ECF 1, ¶ 25.

On April 23, 2020, Tradeways applied for a PPP loan in the amount of $86,000 through its lender, First Citizens Bank (the "Bank"). ECF 2-2, ¶ 26. As noted, when completing the PPP Application, the first question Tradeways was asked was whether it or "any owner" of Tradeways was "presently involved in any bankruptcy?" ECF 12-5; *see* ECF 2-2, ¶ 13. Tradeways answered the question in the affirmative. ECF 2-2, ¶ 14.

Mr. Gorski learned on April 30, 2020, that the Bank denied Tradeways's PPP Application. *Id.* at ¶ 15. According to Tradeways, its PPP Application was rejected on the ground that the Company is ineligible for a PPP loan because Mr. Gorski is involved in an active bankruptcy case. ECF 1, ¶ 27.

According to Mr. Gorski, Tradeways has experienced a "significant" decrease in business revenue since the beginning of the COVID-19 pandemic, placing the Company in financial peril. ECF 2-2, ¶ 7. The Company has only been able to pay employee compensation, monthly obligations, and outstanding business liabilities because it has been drawing from the business's cash reserves. *Id.* ¶ 8. Absent a change in business, Tradeways estimates that it will deplete its cash reserves before August 2020. *Id.* ¶ 9. If that occurs, the Company will have no means to fulfill its financial obligations. *Id.* Therefore, Mr. Gorski posits that without immediate financial support, Tradeways "will likely be forced to cease operations entirely and permanently." *Id.*

## II.    Standard of Review

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Benisek v. Lamone*, ___ U.S. ___, 138 S. Ct. 1942, 1943 (2018) (per curiam); *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020); *Mountain Valley Pipeline LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019); *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc). Rather,

a preliminary injunction is "'granted only sparingly and in limited circumstances.'" *MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (citation omitted).

To qualify for a preliminary injunction, the plaintiff "must establish that he is likely to succeed on the merits." *Winter*, 555 U.S. at 20. Although that standard does not require "a 'certainty of success,'" the plaintiff "'must make a clear showing that he is likely to succeed at trial.'" *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citation omitted). However, "a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek*, 138 S. Ct. at 1943-44.

Rather, the court must consider three other factors: "whether the movant has shown 'that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Id.* (quoting *Winter*, 555 U.S. at 20); *see also Centro Tepeyac*, 722 F.3d at 188 (applying the standard for preliminary injunctions set forth in *Winter*). "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline LLC*, 918 F.3d at 216 (citation omitted). A harm is "irreparable" if it "'cannot be fully rectified by the final judgment after trial.'" *Id.* (citation omitted); *see Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough."). As for the balance of equities and public interest prongs, these two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

A preliminary injunction cannot issue unless all four factors are satisfied. *See Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). The party seeking a preliminary injunction bears the

burden of justifying such relief.  *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d

224, 236 (4th Cir. 2014); *Wagner v. Bd. of Educ.*, 335 F.3d 297, 302 (4th Cir. 2003).

A preliminary injunction can be classified as being either prohibitory or mandatory. A

prohibitory injunction "maintain[s] the status quo and prevent[s] irreparable harm while a lawsuit

remains pending." *Pashby*, 709 F.3d at 319.  In contrast, a mandatory injunction alters the status

quo. *See League of Women Voters of N.C.*, 769 F.3d at 236.  In this setting, the status quo is the

"'last uncontested status between the parties which preceded the controversy.'" *Id.* (quoting

*Pashby*, 709 F.3d at 320).

### III.    Discussion

Tradeways seeks prospective injunctive relief on the grounds that it is likely to show that

the SBA's decision to disqualify bankruptcy debtors from the PPP contravenes the CARES Act;

is arbitrary and capricious; and runs afoul of the Bankruptcy Code's antidiscrimination provision,

11 U.S.C. § 525.  ECF 2-1 at 6-12.  Further, the Company avers that relief is warranted because it

will cease operating if it cannot access PPP funds, setting aside the IFR will not harm the SBA,

and an injunction advances the animating purposes of the CARES Act.  *See id.* at 12-15.

According to defendants, the Company is not entitled to injunctive relief because it cannot

establish a likelihood of success on the merits.  ECF 11 at 11-17.  The Government argues that the

APA does not waive the SBA's sovereign immunity from injunctive relief and, in any event, the

IFR is neither *ultra vires* nor arbitrary and capricious.  In addition, defendants contend that the

Company's reliance on 11 U.S.C. § 525 is misplaced as it does not cover loans.  On the equities,

defendants assert that the Company's financial injuries are speculative and an injunction would

undermine executive and legislative efforts to respond to the pandemic.  *Id.* at 22-24.

I begin with the Company's likelihood of success on the merits. Because I conclude that Tradeways is not likely to prevail under either the APA or 11 U.S.C. § 525, my analysis ends there as well. *See Winter*, 555 U.S. at 24.

## A. APA Claims

Tradeways argues that it is likely to show that the SBA's decision to bar bankruptcy debtors from accessing PPP funds violates the APA. ECF 2-1 at 8-11. Under the APA, a court may set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

The Company advances two theories under the APA. First, it contends that the SBA lacked the statutory authority to bar debtors from the PPP because the unambiguous language of the CARES Act does not permit the alteration of the PPP's eligibility criteria. Second, Tradeways contends that the IFR is arbitrary and capricious, asserting that the exclusion of bankruptcy debtors from the PPP serves no rational interest.

In response, the Government posits that Tradeways's APA claims are foreclosed by sovereign immunity. ECF 11 at 10-11. Further, defendants maintain that the IFR is a reasonable interpretation of the CARES Act and a sensible policy decision in light of a national emergency. *Id.* at 11-17.

### 1. Sovereign Immunity

I turn first to the issue of sovereign immunity. *See United States v. Mitchell*, 463 U.S. 206, 212 (1983) (recognizing that the sovereign's consent is "a prerequisite for jurisdiction"); *Cunningham v. Gen. Dynamics Info. Tech., Inc*., 888 F.3d 640, 649 (4th Cir. 2018) (observing that

a court must dismiss an action barred by sovereign immunity for lack of subject-matter jurisdiction).

It is black letter law that the United States, as a sovereign, generally enjoys immunity from suit. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *Dalehite v. United States*, 346 U.S. 15, 30 (1953); *United States v. Clarke*, 33 U.S. (8 Pet.) 436, 444 (1834); *Robinson v. U.S. Dep't of Educ.*, 917 F.3d 799, 801 (4th Cir. 2019), *cert. denied*, __ U.S. ___, 140 S. Ct. 1440 (2020). Thus, the United States cannot be sued "save as it consents to be sued." *United States v. Sherwood*, 312 U.S. 584, 586 (1941); *see Mitchell*, 463 U.S. 212 (observing that it is "axiomatic that the United States may not be sued without its consent").

As a federal agency, the SBA enjoys "a presumption of immunity from the present lawsuit." *Robinson*, 917 F.3d at 801. And Tradeways, as the plaintiff, has the "burden to show that an unequivocal waiver of sovereign immunity exists and that none of the statute's waiver exceptions apply to his particular claim." *Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005); *see Robinson*, 917 F.3d at 801; *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995).

A "waiver of sovereign immunity must be unequivocally expressed in statutory text," and the waiver must be "clearly evident from the language of the statute." *FAA v. Cooper*, 566 U.S. 284, 290 (2012) (internal quotation marks omitted); *see Lane v. Pena*, 518 U.S. 187, 192 (1996) (observing that a waiver of sovereign immunity "must be unequivocally expressed in statutory text, and will not be implied"). In other words, a waiver of sovereign immunity "cannot contain an ambiguity, which 'exists if there is a plausible interpretation of the statute that would not authorize money damages against the Government.'" *Robinson*, 917 F.3d at 802 (quoting *Cooper*, 566 U.S. 290-91). Moreover, waivers of sovereign immunity "must be 'strictly construed in favor of the sovereign.'" *Welch*, 409 F.3d at 650 (ellipses omitted) (quoting *Lane*, 518 U.S. at 192).

Simply put, sovereign immunity "can only be waived by statutory text that is unambiguous and unequivocal." *Robinson*, 917 F.3d at 802.

The APA evinces a waiver of sovereign immunity with respect to certain claims.  Section 702, entitled "Right of Review," provides, in part, 5 U.S.C. § 702:

> A person suffering legal wrong because of agency action, or  adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed . . . on the ground that it is against the United States or that the United States is an indispensable party.

Read in isolation, this language would seem to thrust open the courthouse doors for Tradeways, which seeks only injunctive and declaratory relief against defendants.  But, the APA's waiver of sovereign immunity is qualified.  Section 702 also provides, *id.*: "Nothing herein . . . confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."

Here, the Government posits that the Small Business Act, 15 U.S.C. § 631 *et seq.*, shields the SBA from the injunctive relief that plaintiff seeks.  ECF 11 at 10-11.  In relevant part, the statute provides, 15 U.S.C. § 634(b)(1) (emphasis added):

**(b) Powers of Administrator**

In the performance of, and with respect to, the functions, powers, and duties vested in him by this chapter the Administrator may—

(1) sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy; *but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Administrator or [her] property . . . .*

Courts are openly divided over whether § 634(b)(1) precludes injunctive relief against the SBA under all circumstances.  *See, e.g.*, *Elk Assocs. Funding Corp. v. U.S. Small Bus. Admin.*, 858

16

F. Supp. 2d 1, 20 (D.D.C. 2012) (canvassing the split).  Some courts have interpreted § 634(b)(1) to be without qualification.  *See, e.g.*, *In re Hidalgo Cty. Emergency Servs. Found.*, ___ F.3d ___, 2020 WL 3411190 (5th Cir. June 22, 2020) (reversing preliminary injunction issued against the SBA, pursuant to § 634(b)(1) and binding circuit precedent); *Mar v. Kleppe*, 520 F.2d 867, 869 (10th Cir. 1975.  In contrast, other courts have construed § 634(b)(1) to bar injunctions against the SBA when it is acting qua commercial actor, but not qua regulator.  *See, e.g.*, *Ulstein Mar., Ltd. v. United States*, 833 F.2d 1052, 1056-57 (1st Cir. 1987); *Cavalier Clothes, Inc. v. United States*, 810 F.2d 1108, 1112 (Fed. Cir. 1987); *Related Indus., Inc. v. United States*, 2 Cl. Ct. 517, 522 (1983); *Okla. Aerotronics v. United States*, 661 F.2d 976, 977 (D.C. Cir. 1981).[7]

To my knowledge, the Fourth Circuit has addressed § 634(b)(1) in three published opinions.  First, in *Vincent v. Small Business Administration*, 402 F.2d 769 (4th Cir. 1968), the Fourth Circuit, citing § 634(b)(1), summarily affirmed the district court's dissolution of a state court injunction restraining the foreclosure of real property on which the SBA held a lien.  *Id.* at 770.  In *Duncan v. Furrow Auction Co.*, 564 F.2d 1107 (4th Cir. 1977), the Court affirmed the district court's dismissal of a suit seeking to enjoin a foreclosure sale of property held by the SBA, observing that § 634(b)(1) "prohibits an injunction, which was all the relief asked for, against the SBA" by the plaintiffs.  *Id.*  Finally, the Fourth Circuit held in *J.C. Driskill, Inc. v. Abdnor*, 901 F.2d 383 (4th Cir. 1990), that the plaintiffs, subcontractors who sought to recover payment for work perform on a construction project managed by the SBA, were not entitled to an equitable lien

---

[7] At the hearing, the parties agreed that § 634(b)(1) has no bearing on the Court's ability to enjoin the Treasury Department and Secretary Mnuchin under the APA.  But, they are nominal defendants. Tradeways seeks to set aside a rule promulgated by the SBA governing the administration of the PPP, a program managed by the SBA.  If the Court were to grant the Company relief, the injunction would have to run against the SBA in order to redress the allegedly unlawful conduct. Thus, the presence of other defendants does not resolve the issue of sovereign immunity.

on project funds held by the SBA on the grounds that "courts have no jurisdiction to award injunctive relief against the SBA."  *Id.* at 386.

Significantly, none of these cases concerns the scope of § 634(b)(1).  Moreover, these decisions are materially distinguishable from the one *sub judice*.  The plaintiffs in *Vincent*, *Duncan*, and *J.C. Driskill*, each sought to stop the SBA from performing commercial activities in its capacity as a market participant, such as initiating foreclosure proceedings, selling property, and failing to perform on a contract.  In contrast, this dispute concerns the SBA in its capacity as a regulatory agency.  Specifically, it pertains to the lawfulness of a rule promulgated by the SBA that regulates the conduct of private actors—lenders and borrowers—in furtherance of a multibillion dollar federal aid program.  Therefore, the Fourth Circuit's case law offers little guidance as to whether § 634(b)(1) poses an insurmountable obstacle to plaintiff's lawsuit.  *But see iThrive Health, LLC v. Carranza*, No. 20-00151, ECF 24 at 8 (Bankr. D. Md. June 8, 2020) (concluding that Fourth Circuit precedent "does not leave room" to adopt a narrow view of § 634).

Writing on a blank slate, each side can marshal compelling arguments to broaden or trim the scope of § 634(b)(1).  I start with the language of § 634(b)(1) in accordance with the cardinal canon of construction that courts first look to a law's text to divine its meaning.  *See Murphy v. Smith*, __ U.S. ___, 138 S. Ct. 784, 787 (2018); *United States v. Bryant*, 949 F.3d 168, 174 (4th Cir. 2020).  When the statute's text is "unambiguous, then, this first canon is also the last," for "courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

Taken at face value, § 634(b)(1)'s language appears unambiguous and unqualified: "no injunction . . . shall be issued against the Administrator" means exactly what it says—no court may issue injunctive relief against the SBA.  *See Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227

(2014) ("It is a 'fundamental canon of statutory construction' that, 'unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.'") (citation omitted); *accord Bostock v. Clayton County*, No. 17-1618, 2020 WL 3146686, at *14 (U.S. June 15, 2020).  Under this straightforward reading of § 641(b)(1), a court may never enjoin the SBA, regardless of the circumstances giving rise to the lawsuit.

However, the words in a statute "'cannot be construed in a vacuum.'"  *Sturgeon v. Frost*, ___ U.S. ___, 136 S. Ct. 1061, 1070 (2016) (citation omitted); *see Gundy v. United States*, ___ U.S. ___, 139 S. Ct. 2116, 2126-29 (2019) (rejecting defendant's construction of statutory language as divorced from the statute's context and history).  Relevant here, the doctrine of *ejusdem generis* counsels that a general term contained in a statutory enumeration should be construed to embrace only objects similar in nature to those objects enumerated by the specific terms.  *See Epic Sys. Corp. v. Lewis*, ___ U.S. ___, 138 S. Ct. 1612, 1625 (2018); *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001); *Sky Cable, LLC v. DIRECTV, Inc.*, 886 F.3d 375, 388 (4th Cir. 2018); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 199 (2012).  Applying that canon to § 634(b)(1) cautions against reading "injunction" more broadly than the company it keeps.

There are many species of injunction.  Injunctions range in duration from the temporary to the permanent.  *See, e.g.*, Fed. R. Civ. P. 65.  They also vary in their effect.  As noted, injunctions can be prohibitory or mandatory.  *See Pashby*, 709 F.3d at 320.  The former maintains the status quo by restraining a party from certain conduct; the latter compels a party to perform a specific act.  *Compare Roe*, 947 F.3d at 234 (affirming preliminary injunction barring the Air Force from discharging HIV positive servicemembers), *with Brown v. Plata*, 563 U.S. 493 (2011) (affirming judicial order requiring California to reduce its prison population).  And, injunctions arise in

circumstances too numerous to count and thus are deployed to remedy vastly different harms.  For instance, an injunction directing a private party to perform on a contract is qualitatively different from an injunction ordering the federal government to refrain from unconstitutional conduct.

Here, the term "injunction" is arguably narrowed by the other items listed in § 634(b)(1)— "attachment" and "garnishment."  An "attachment" is the seizure of a person's property to secure a judgment.  *Attachment*, BLACK'S LAW DICTIONARY (11th ed. 2019).  And, a "garnishment" is a judicial proceeding in which a creditor seeks a court order compelling a third party to turn over a debtor's assets.  *Garnishment*,  BLACK'S LAW DICTIONARY (11th ed. 2019).  Thus, these actions, both of which are forms of equitable relief, suggest that the term "injunction" in § 634(b)(1) should be read to prohibit courts from interfering with the SBA's commercial operations or property, but not to bar all relief, such as where the SBA exceeds its statutory authority.  The upshot is that the text of § 634(b)(1) is amenable to more than one plausible reading.

The legislative history of § 634(b)(1) also points in both directions.  On the one hand, the legislative history of the Small Business Act provides no insight into the purpose of § 634(b)(1), which supports the government's argument that the text simply means what it says.  *See Ulstein*, 833 F.2d at 1056. That said, the enactment history of identical "no injunction clauses" in analogous statutes suggests that Congress did not intend § 634(b)(1) to confer blanket immunity on the SBA. As other courts have recounted, the "no injunction" language found in § 634(b)(1) arose in the wake of *Federal Housing Administration v. Burr*, 309 U.S. 242 (1940), in which the Supreme Court held that a clause allowing the Federal Housing Authority to "sue and be sued" waived the agency's sovereign immunity to civil processes, such as garnishment actions.  *See Ulstein*, 833 F.2d at 1056-57; *Related Indus.*, 2 Cl. Ct. at 522.  In response, Congress inserted "no injunction" language in the enabling statutes of agencies that participate in commerce in order to preserve the

public fisc.  *See, e.g.*, 7 U.S.C. § 1506(d) (Federal Crop Insurance Corporation); 15 U.S.C. § 714b(c) (Commodity Credit Corporation); 42 U.S.C. § 3211(11) (Department of Commerce).  This context suggests that § 634(b)(1)'s purpose is to prevent creditors "from hindering and obstructing agency operations through mechanisms such as attachment of funds," not to immunize the SBA from judicial review.  *Ulstein*, 833 F.2d at 1056-57.

Given the two competing interpretations of § 634(b)(1), both sides urged the Court at the hearing to consider the practical consequences of the statute's scope.  In plaintiff's view, a broad reading of § 634(b)(1) would lead to the absurd result of shielding the SBA from judicial review, even when it exceeds its statutory authority or violates the Constitution.  *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 973 (1982) (noting that interpretations that generate "absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available").  In the Government's view, there is nothing absurd about sovereign immunity.  And, as the Government correctly observes, the Court may not blue pencil a statute; "such editorial freedom . . . belongs to the Legislature, not the Judiciary."  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 510 (2010).

At this juncture, I need not conclusively decide whether § 634(b)(1) bars plaintiff's request for injunctive relief under the APA.  *See Am. Assoc. of Political Consultants v. U.S. Small Bus. Admin.*, ___ F. Supp. 3d ___, 2020 WL 1935525, at *6 (D.D.C. April 21, 2020).  At a minimum, however, the specter of § 634(b)(1) casts doubt on plaintiff's likelihood of success under the APA. *See id.*

## 2.  Whether the IFR Contravenes the CARES Act

Tradeways urges the Court to enjoin the SBA's IFR, contending that the SBA lacks statutory authority to exclude bankruptcy debtors from accessing the PPP.  ECF 2-1 at 8-9.

21

Specifically, the Company argues that the CARES Act does not permit such a rule, and therefore the IFR is "not . . . in accordance with law." 5 U.S.C. § 706(2)(A).

Both sides agree that the Court should assess whether the SBA's IFR accords with the CARES Act under the framework established in *Chevron v. U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), a two-prong test designed to determine whether an agency "has stayed within the bounds of its statutory authority" when issuing an action. *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (emphasis omitted); *see PETA v. U.S. Dep't of Agric.*, 861 F.3d 502, 506 (4th Cir. 2017); *see also* ECF 2-1 at 8-9; ECF 12 at 12-13. At the first step, also referred to as *Chevron* Step One, the court applies ordinary tools of statutory construction to determine "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842; *see City of Arlington*, 569 U.S. at 296. If so, and "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43; *see City of Arlington*, 569 U.S. at 296.

If, however, "the statute is silent or ambiguous with respect to the specific issue," then the court proceeds to *Chevron* Step Two. *Chevron*, 467 U.S. at 843; *City of Arlington*, 569 U.S. at 296. Under *Chevron* Step Two, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843; *City of Arlington*, 569 U.S. at 296. At this step in the *Chevron* analysis, the "reviewing court must respect the agency's construction of the statute so long as it is permissible." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000); *see also Dada v. Mukasey*, 554 U.S. 1, 29 n.1 (2008) (observing that an "agency need not adopt . . . the best reading of the statute, but merely one that is permissible"); *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) (opining that at *Chevron*

*Step Two*, a regulation "is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute").

According to Tradeways, the CARES Act unambiguously conveys Congress's intent to allow entities to participate in the PPP regardless of bankruptcy debtor status.  In this regard, the Company observes that the CARES Act sets forth the exclusive eligibility criteria for the PPP. Further, the Company maintains that the CARES Act's express prohibition as to bankruptcy debtors in the mid-size loan program reveals that Congress intended no such barrier to the PPP. Neither contention is persuasive.

Plaintiff first contends that the CARES Act directly addresses the eligibility criteria to participate in the PPP.  In particular, the Company focuses on the language of the CARES Act providing that "in addition to small business concerns, *any* business concern, nonprofit organization, veterans organization, or Tribal business concern . . . *shall be eligible* to receive a covered loan if" the borrower "employs not more than the greater of" either "500 employees" or "the size standard in number of employees established by the Administration for the industry in which the [borrower] operates."  15 U.S.C. § 636(a)(36)(D)(i) (emphasis added).  According to Tradeways, the use of the term "any" establishes that an applicant is entitled to PPP funds so long as it satisfies the two statutorily enumerated criteria in § 636(a)(36)(D)(i), *i.e.*, business type and size.  In its view, the statute leaves no room for the SBA to establish other eligibility criteria.

 Other courts have embraced this argument, reasoning that § 636(a)(36)(D)(i) serves to preclude the existence of other eligibility criteria.  *See*, *e.g.*, *DV Diamond Club of Flint, LLC v. U.S. Small Bus. Admin.*, ___ F. Supp. 3d ___, 2020 WL 2315880, at *10 (E.D. Mich. May 11, 2020) (concluding that "the text of the PPP makes clear that every business concern meeting the statutory criteria is eligible for a PPP loan during the covered period").  And, it is true that the term

"any" carries "an expansive meaning,'" which "ordinarily 'refer[s] to a member of a particular group or class without distinction or limitation' and in this way 'impl[ies] every member of the class or group.'"  *SAS Inst., Inc. v. Iancu*, ___ U.S. ___, 138 S. Ct. 1348, 1354 (2018) (alterations in *SAS Inst.*) (citations omitted).  But, in fixating on § 636(a)(36)(D)(i), Tradeways misses the forest for the trees.

As the Supreme Court has instructed, when "making the threshold determination under *Chevron*, 'a reviewing court should not confine itself to examining a particular statutory provision in isolation.'"  *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) (quoting *Brown & Williamson Tobacco Corp.*, 529 U.S. at 132).  Rather, the court must "interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole."  *Brown & Williamson Tobacco Corp.*, 529 U.S. at 132 (internal quotation marks and citations omitted).

Section 636(a)(36)(D)(i), when viewed in the overall statutory scheme, merely serves to identify the types and size of organizations that are eligible to receive PPP funds.  For starters, other provisions of the CARES Act contemplate the existence of eligibility criteria beyond the type of entity and number of employees.  For instance, the CARES Act waives the requirement applicable to most § 7(a) loans that a borrower demonstrate that it is unable to obtain credit elsewhere.  *See* 15 U.S.C. § 636(a)(36)(I) (waiving requirement for PPP); *see, e.g.*, 15 U.S.C. § 636(m)(2)(E) (requiring a borrower under the SBA's microloan program to show that it is "unable to obtain credit elsewhere at comparable interest rates").  And, the CARES Act clarifies that unless otherwise provided, "the Administrator may guarantee covered loans under the same terms, conditions, and processes as a loan made under" the PPP.  15 U.S.C. § 636(a)(36)(B). Yet, these provisions would be entirely superfluous if § 636(a)(36)(D)(i) eliminated all preexisting

24

eligibility criteria.  Thus, plaintiff's construction of § 636(a)(36)(D)(i) is untenable in light of the broader structure of the CARES Act.  *See Diocese of Rochester v. U.S. Small Bus. Admin.*, ___ F. Supp. 3d ___, 2020 WL 3071603, at *6-7 (W.D.N.Y. June 10, 2020) (rejecting the contention that the text of § 636(a)(36)(D) precludes other eligibility criteria); *accord Penobscot Valley Hosp. v. Carranza*, No. 19-10034, 2020 WL 3032939, at *8 (Bankr. D. Me. June 3, 2020); *Schuessler v. U.S. Small Bus. Admin.*, No. AP 20-02065-BHL, 2020 WL 2621186, at *2 (Bankr. E.D. Wis. May 22, 2020).

Furthermore, plaintiff's reading of § 636(a)(36)(D)(i) puts the CARES Act on a collision course with the Small Business Administration Act and longstanding SBA regulations.  As noted, Congress put the PPP in § 7(a) of the Small Business Act.  And, § 7(a) requires the SBA to ensure that loans "shall be of such sound value or so secured as reasonably to assure repayment." 15 U.S.C. § 636(a)(6).  Pursuant to that mandate, the SBA requires an applicant seeking a § 7(a) loan to disclose on its application, Form 1919, whether the borrower or its affiliate has "ever filed for bankruptcy protection."  ECF 12-1 (SBA Form 1919: "SBA 7(a) Borrower Information Form").  By regulation, the requirements listed on Form 1919 comprise part of the "loan program requirements."  13 C.F.R. § 120.10.

In enacting the CARES Act, Congress was presumably aware of this regulatory scheme. *See Miss. ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014) (observing that courts "presume that 'Congress is aware of existing law when it passes legislation'") (citation omitted); *United States v. Wilson*, 290 F.3d 347, 357 (D.C. Cir. 2002) (taking as a given that Congress  is "aware of established practices and authoritative interpretations of the coordinate branches"). Therefore, had Congress intended the CARES Act to eliminate all eligibility criteria governing SBA loans administered under § 7(a) of the Small Business Act, one would expect Congress to

have spoken clearly. *See Whitman v. Am. Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001) (admonishing that Congress "does not . . . hide elephants in mouseholes"); *see also Bostock*, 2020 WL 3146686, at *17 (recognizing the vitality of the "no-elephants-in-mouseholes canon"). Indeed, the CARES Act's omission of any reference to bankruptcy in regard to the PPP militates against reading § 636(a)(36)(D)(i) to abrogate, rather than preserve, § 7(a)'s command that the SBA ensure its loans are financially sound. *See Battle v. Ledford*, 912 F.3d 708, 717 (4th Cir. 2019) ("It is a cardinal rule that 'repeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal is clear and manifest.'") (quoting *Hui v. Castaneda*, 559 U.S. 799, 810 (2010)).

Plaintiff's reliance on the CARES Act provisions establishing a loan program for mid-size businesses is equally unavailing. In the Company's view, because the § 4003(b)(3)(D)(V) of the CARES Act expressly precludes bankruptcy debtors from participating in the mid-size business loan program but not the PPP, the SBA has no discretion to limit eligibility to the PPP based on debtor status. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citation and alteration omitted). But, as the D.C. Circuit has explained, when interpreting a law governing agency action, such statutory silence "'suggests not a prohibition but simply a decision not to mandate any solution in the second context, *i.e.*, to leave the question to agency discretion.'" *Catawba County v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009) (quoting *Cheney R. Co. v. ICC*, 902 F.2d 66, 69 (D.C. Cir. 1990)). That guidance applies with extra force here, where Congress chose to codify the PPP and the mid-size business loan program in separate sections of the United States Code. *See United States v. Granderson*, 511 U.S. 39, 63 (1994)

(Kennedy, J., concurring) (explaining that the *Russello* presumption "loses some of its force when the sections in question are dissimilar and scattered at distant points of a lengthy and complex enactment").

In sum, nothing in the CARES Act unambiguously addresses whether bankruptcy debtors are eligible to participate in the PPP.   *See Diocese of Rochester*, 2020 WL 3071603, at *6-7; *Penobscot Valley Hosp.*, 2020 WL 3032939, at *8; *Schuessler*, 2020 WL 2621186, at *2. Therefore, I shall proceed to *Chevron* Step Two.

As noted, at the second step of the *Chevron* analysis a court asks whether the "agency's rule "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.  An agency's interpretation of a statute meets this standard "so long as the interpretation is not 'arbitrary, capricious, or manifestly contrary to the statute.'"  *Philip Morris USA, Inc. v. Vilsack*, 736 F.3d 284, 290 (4th Cir. 2013) (quoting *Chevron*, 467 U.S. at 844).  In addition, "[a] construction meets this standard if it 'represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute.'"  *Philip Morris USA*, 736 F.3d at 290 (quoting *Chevron*, 467 U.S. at 845).  The SBA's decision easily surpasses the second step of the *Chevron* analysis.

As the SBA's IFR explains, the agency decided to exclude bankruptcy debtors or entities owned by such debtors from the PPP based on its "determin[ation] that PPP loans to debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds or non-repayment of unforgiven loans." 85 Fed. Reg. at 2,3451.  The SBA's bankruptcy eligibility criteria did not arise out of thin area.  Rather, the SBA's preexisting § 7(a) loan application asks a prospective borrower to disclose whether it or an affiliate has filed for bankruptcy.  ECF 12-1.

To be sure, an affirmative answer on the SBA's preexisting form for a § 7(a) loan application does not automatically render the applicant ineligible for a loan. *See id.* But, the CARES Act was passed in the midst of an unprecedent global pandemic in order to stop the nation's economic tailspin. Time was of the essence. And, Congress clearly communicated the urgency of the crisis to the SBA, giving it just 15 days to promulgate regulations to implement the PPP. 15 U.S.C. § 9012. In response, the SBA chose to adopt a bright-line rule in order to expedite the underwriting process and facilitate the hasty distribution of PPP funds, instead of issuing a flexible standard that would require lenders to scrutinize each PPP application on a case-by-case basis. *See* 85 Fed. Reg. 20,811 (noting that the "intent of the [CARES] Act is that SBA provide relief to America's small businesses expeditiously, which is expressed in the Act by giving all lenders delegated authority and streamlining the requirements of the regular 7(a) loan program"); *see generally Louis Kaplow*, *Rules Versus Standards: An Economic Analysis*, 42 DUKE L.J. 557 (1992).

The SBA could have prioritized accessibility over efficiency and thus decided to adopt a totality-of-the-circumstances approach, instead of a bright line rule. Or, the agency could have decided to exclude some bankruptcy debtors but not others from the PPP. But, the Court cannot conclude that the SBA's rule is an unreasonable interpretation of the priorities evinced in the CARES Act. *See Diocese of Rochester*, 2020 WL 3071603, at *9; *Penobscot Valley Hosp.*, 2020 WL 3032939, at *9.

Accordingly, I find that Tradeways is unlikely to establish that the SBA's IFR exceeds the SBA's authority under the CARES Act.

### 3.   Whether the IFR is Arbitrary and Capricious

Plaintiff posits that the Court should enjoin the SBA's IFR on the basis that it is arbitrary and capricious.  5 U.S.C. § 706(2)(A); *see* ECF 2-1 at 9-11.  A rule is arbitrary and capricious if (1) the agency "has relied on factors which Congress has not intended it to consider"; (2) the agency "entirely failed to consider an important aspect of the problem"; (3) the agency's explanation "runs counter to the evidence before the agency"; or (4) the explanation "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Appalachian Voices v. State Water Control Bd.*, 912 F.3d 746, 753 (4th Cir. 2019).

The APA holds federal agencies accountable to the public by requiring agencies to comply with procedures before acting and by providing for judicial review after the fact.  *See Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).  Under the APA, a court must "set aside" agency actions that are "arbitrary" or "capricious."  5 U.S.C. § 706(2)(A); *see, e.g.*, *Dep't of Homeland Sec. v. Regent of the Univ. of Calif.*, No. 18-587, 2020 WL 3271746 (U.S. June 18, 2020).  "To survive review under the arbitrary and capricious standard, an agency decision must show that the agency examined 'the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Appalachian Voices*, 912 F.3d at 753 (quoting *State Farm*, 463 U.S. at 43).  In short, the APA requires agencies to engage in "'reasoned decisionmaking.'"  *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (citation omitted).

The APA directs that "the court shall review the whole record or those parts of it cited by a party."  5 U.S.C. § 706(2).  Ordinarily, this inquiry "is limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record."  *Dep't of Commerce v. New York*, ___ U.S. ___, 139 S. Ct. 2551, 2573 (2019); *see Dep't of Homeland Sec.*, 2020 WL

3271746, at *9.  Hence, "the focal point for judicial review" under the APA "should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).[8]

Review under the APA is highly deferential, and the agency action enjoys a presumption of validity.  *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009).  Moreover, the court "is not to substitute its judgment for that of the agency."  *State Farm*, 463 U.S. at 43; *see also Dep't of Commerce*, 139 S. Ct. at 2569.  Thus, so long as the agency "'provide[s] an explanation of its decision that includes a rational connection between the facts found and the choice made,' its decision should be sustained."  *Perez v. Cissna*, 914 F.3d 846, 855 (4th Cir. 2019) (quoting *Ohio Valley Envtl. Coal.*, 556 F.3d at 192); *see also State Farm*, 463 U.S. at 43, (noting that a court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"). That said, the arbitrary and capricious standard "'does not reduce judicial review to a rubber stamp of agency action.'"  *Ergon-W. Va., Inc. v. EPA*, 896 F.3d 600, 609 (4th Cir. 2018) (citation omitted); *Judulang v. Holder*, 565 U.S. 42, 53 (2011) (observing that "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking").

For the reasons set out above, Tradeways is not likely to show that the SBA has acted in an arbitrary and capricious manner.  *See Judulang*, 565 U.S. at 52 n.7 (observing that *Chevron* step two and arbitrary and capricious review is often "the same").  Notably, in its Motion, Tradeways does not contend that the SBA relied on factors outside the scope of the CARES Act, failed to give due weight to countervailing considerations, ignored conflicting data, or issued a facially implausible rationale. *State Farm*, 463 U.S. at 753.  Instead, the Company generally asserts that

---

[8] For this reason, the Court does not rely on the Declaration of John A. Miller, Deputy Associate Administrator for Capital Access at the SBA.  ECF 12-4.  He addresses the Company's APA claims.

the SBA's decision to exclude bankruptcy debtors is irrational because the PPP does not include a creditworthiness requirement.  *See* ECF 2-1 at 10-11; ECF 15 at 4.  But, as discussed, what Tradeways considers arbitrary agency action is simply the SBA filling in the gaps Congress left in the CARES Act so that it could nimbly respond to a complex, rapidly-evolving crisis.

In conclusion, because the SBA's rule is neither *ultra vires* nor arbitrary, plaintiff is unlikely to succeed on its APA claims.  It follows that its APA claims do not support the issuance of a preliminary injunction.

### B.  Claim under 11 U.S.C. § 525

Separate from the APA, Tradeways contends that the government's decision to exclude bankruptcy debtors from the PPP violates the Bankruptcy Code's antidiscrimination statute, 11 U.S.C. § 525(a).  ECF 2-1 at 12. [9]

Section 525(a) of the Bankruptcy Code provides, in relevant part, 11 U.S.C. § 525(a) (emphasis added):

> [A] governmental unit may not deny, revoke, suspend, or refuse to renew *a license, permit, charter, franchise, or other similar grant to* . . . a person that is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act . . . .

The meaning of § 525(a) "is plain": it "clearly specifies that its protections extend to 'licenses, permits, charters, [and] franchises,' and to grants 'similar' to those items."  *Ayes v. U.S. Dep't of Vet. Affairs*, 473 F.3d 104, 108 (4th Cir. 2006) (alteration in *Ayes*).  Therefore, establishing

---

[9] In contrast to Tradeways's APA claims, there is no dispute that sovereign immunity poses no obstacle to plaintiff's discrimination claim arising under the Bankruptcy Code.  Section 106(a)(1) of the Bankruptcy Code provides that "sovereign immunity is abrogated as to a governmental unit . . . with respect to" claims asserting violations of 11 U.S.C. § 525.  *See* 11 U.S.C. § 106(a)(1).

a violation of § 525(a) is straightforward.  The plaintiff "must show that (1) the [defendant] is a governmental unit, (2) the [denied property interest] is an item covered by the statute, and (3) the [defendant] discriminated against [the plaintiff] solely because of [the plaintiff's or its associate's] discharges in bankruptcy."  *Id.* at 107; *see Stoltz v. Brattleboro Hous. Auth.*, 315 F.3d 80 (2d Cir. 2002) (holding public housing lease fell within § 525(a)); *Toth v. Mich. State Hous. Dev. Auth.*, 136 F.3d 477 (6th Cir. 1998) (holding § 525(a) did not cover the denial of a public home improvement loan); *Watts v. Pa. Hous. Fin. Co.*, 876 F.2d 1090 (3d Cir. 1989) (holding public home loan did not implicate § 525(a)); *In re Exquisito Servs., Inc.*, 823 F.2d 151 (5th Cir. 1987) (holding § 525(a) applied to SBA program).

The parties do not dispute that the SBA is a government unit, or that the Company's PPP application was denied because of Mr. Gorski's status as a bankruptcy debtor.  Thus, Tradeways's discrimination claim hinges on whether § 525(a) extends to the PPP.  According to Tradeways, it is likely to prevail on its discrimination claim because the PPP "is in essence a grant program." ECF 2-1 at 11.  In response, the Government argues that the PPP is a loan, not a grant, and certainly not a grant "similar" to a government-provided license, permit, charter, or franchise.  ECF 12 at 18-22.  I agree with the Government.

To start, the Company's effort to dress up the PPP as a grant runs head long into the plain language of the CARES Act.  The text of the CARES Act specifies that proceeds disbursed under the PPP are loans, not grants.  The CARES Act clarifies that "a loan made under this paragraph" is a "covered loan" and that an "eligible recipient" is an "individual or entity that is eligible to receive a covered loan."  15 U.S.C. § 636(a)(36)(A)(ii), (iv).  In a section titled "Paycheck Protection Loans," the CARES Act authorizes the Administrator to "guarantee covered loans" issued pursuant to the PPP.  *Id.* § 636(a)(36)(B).  When PPP proceeds are disbursed, the CARES

Act directs the Administrator to "register the loan" no less than "15 days after the date on which a loan is made . . . ." *Id.* § 636(a)(36)(C).  The section that addresses the amount of PPP funds that a borrower can receive is titled "Maximum loan amount." *Id.* § 636(a)(36)(E).  And, the CARES Act specifies that "lenders" who approve "loans under this subsection" are exercising the Administrator's authority to "make and approve covered loans." *Id.* § 636(a)(F)(ii)(l).

In total, the word "loan" appears some 75 times in the CARES Act provisions establishing the PPP.  The takeaway is clear: the $659 billion disbursed to borrowers through the PPP are loans, not grants.

If more evidence were needed to confirm that the PPP is a loan, one need only look to statutory context.  The canons of statutory interpretation teach that "'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Gundy*, 139 S. Ct. at 2126 (citation omitted). In establishing the PPP, Congress did not create a new subchapter of Title 15, as it did for the loan program for mid-size businesses.  *See* 15 U.S.C. § 9042.  Instead, the CARES Act added the PPP as a subsection to 15 U.S.C. § 636(a).  This is significant because 15 U.S.C. § 636(a) concerns the Administrator's authority to "to make loans to any qualified small business concern," either directly or through a lender on a guaranteed basis. In addition to the PPP, § 636 sets out the statutory scheme for disaster loans, 15 U.S.C. § 636(b); loans for handicapped persons, *id.* § 636(h); loans for small businesses in low income areas, *id.* § 636(j); and microloans, *id.* § 636(m).  Thus, the location of the PPP in the United States Code fortifies the conclusion that the PPP is a loan program.

Tradeways resists this conclusion.  In its view, the PPP funds are better understood as grants because, in light of the program's generous forgiveness terms, the PPP amounts, in effect,

to "free money." But, the fact that PPP proceeds are forgivable does not make the money an outright gift.

For one thing, an amount borrowed under the PPP is not invariably forgiven. 15 U.S.C. § 9005(b). For instance, the CARES Act provides that the amount of loan forgiveness is reduced if the borrower decreases any employee's salary by more than 25 percent during the covered period. *Id.* § 9005(d)(3)(A). The CARES Act also provides that in order to be eligible for forgiveness, the borrower must spend at least 60 percent of the loan amount towards payroll costs. *Id.* § 9005(d)(8). And, significantly, the SBA requires borrowers who receive PPP funds to sign a promissory note. *See* 85 Fed. Reg. 23,450-51; SBA Form 147.

Moreover, the possibility of forgiveness is unremarkable. Many federal loan programs allow some or all of the amount borrowed to be forgiven, depending on the circumstances. *See, e.g.*, 20 U.S.C. § 1087e(m)(1) (Public Service Loan Forgiveness Program); 20 U.S.C. § 1087j(b) (Teacher Loan Forgiveness Program). Thus, as other courts have concluded, the mere existence of favorable forgiveness terms in the CARES Act does not transform a PPP loan into a grant. *See, e.g.*, *Diocese of Rochester*, 2020 WL 3071603, at *10; *Penobscot Valley Hosp.*, 2020 WL 3032939, at *15; *Schuessler*, 2020 WL 2621186, at *2. *But see In re Roman Cath. Church of Archdiocese of Santa Fe*, ___ B.R. ___, 2020 WL 2096113, at *4 (Bankr. D. N.M. May 1, 2020).

The conclusion that the PPP is a loan program is fatal to Tradeways's claim arising under 11 U.S.C. § 525(a). Section 525(a) carefully delineates those various property interests that it reaches, including licenses, permits, charters, and franchises. Loans are conspicuously absent from that list.

It is true that § 525(a)'s list includes the generic term "similar grant." However, the negative implication canon of *expressio unius est exclusio alterius*—"the expression of one thing

is the exclusion of another"—counsels against reading § 525(a) to encompass loans. *See Me. Cmty. Health Options v. United States*, ___ U.S. ___, 140 S. Ct. 1308, 1323 (2020); *Loughrin v. United States*, 573 U.S. 351, 358 (2014); Scalia & Garner, *supra*, at 107-11. That is especially so where § 525(c) expressly prohibits discrimination based on bankruptcy status with respect to student loan programs. *See Ayes*, 473 F.3d at 110-11 (reasoning that the *expressio unius* maxim applies with "great force" to § 525(a), (c)). Given that 11 U.S.C. § 525(a) does not extend to loans, it follows that it does not prohibit the SBA from rendering bankruptcy debtors ineligible from the PPP.

Nonetheless, assuming, *arguendo*, that PPP funds are really grants masquerading as loans, the PPP still does not fall within the ambit of § 525(a). That is so because even if PPP proceeds are characterized as a grant, it is not a grant "similar" to a "license, permit, charter, franchise" issued by the government. 11 U.S.C. § 525(a).

The case of *Ayes v. U.S. Department of Veterans Affairs*, 473 F.3d 104 (4th Cir. 2006), is instructive. In *Ayes*, the plaintiffs, a group of veterans, sued the Department of Veterans Affairs (the "VA"), alleging that the VA's refusal to restore their veteran home-loan guaranty entitlements solely because of their discharge from bankruptcy violated 11 U.S.C. § 525(a). *Id.* at 105. The Fourth Circuit agreed that the VA guaranty entitlement was a grant, but it concluded that it was not "similar" to the items listed in § 525(a). *Id.* at 108, 111.

In construing the term "grant," the Court explained that "the use of the word 'similar' limits the universe of 'grants' to which § 525(a) applies, ensuring that only grants bearing a family resemblance to licenses, permits, charters, and franchises enjoy the anti-discrimination protections of the Bankruptcy Code." *Id.* at 108. According to the Court, "[l]icenses, permits, charters, and franchises are all governmental authorizations that typically permit an individual to pursue some

occupation or endeavor aimed at economic betterment." *Id.* at 108.  That is, these interests "'implicate 'government's role as a gatekeeper in determining who may pursue certain livelihoods.'"  *Id.* at 109 (quoting *Toth*, 136 F.3d at 480).  For example, a government entity's refusal to issue "a commercial real estate license to a bankrupt individual completely forecloses that individual from legally pursuing a career as a commercial realtor."  *Id.*

Viewed from this vantage point, the Court concluded that "the veteran guaranty entitlement bears no such resemblance to the items listed in § 525(a)." *Id.* at 108.  Unlike a real estate license, the VA's home-loan program "does not implicate the government's gate-keeping role in determining who may pursue certain livelihoods because . . . a person can obtain a home loan or guaranty from the private sector."  *Id.* at 109.  As the Court pointed out, an individual denied a government-guaranteed home loan "is not doomed to homelessness; he may seek a guaranty from family or friends, may seek another private loan, perhaps on less favorable terms, or he may rent." *Id.*  Therefore, because "governmental units do not exercise exclusive or even pervasive control over the 'world' of home loans," the Court held that a VA home-loan guaranty was "not an 'other similar grant' within the meaning of § 525(a)."  *Id.* at 109, 111.

The same reasoning applies here.  Unlike the denial of a medical license or a building permit, the rejection of a borrower's PPP application does not "completely foreclose[]" the borrower "from legally pursuing a career." *Ayes*, 473 F.3d at 109.  To the contrary, the borrower remains uninhibited to conduct business.  And, like the VA home-loan guaranty, the PPP  is not the only source of capital; Tradeways could, for example, seek a traditional loan from a bank. Indeed, defendants hardly "exercise exclusive or even pervasive control over the 'world'" of small business loans.  *Id.*

In sum, *Ayes* compels the conclusion that even were the PPP characterized as a grant, it does not implicate § 525(a). *See, e.g., Diocese of Rochester*, 2020 WL 3071603, at *10; *Schuessler*, 2020 WL 2621186, at *9. Accordingly, because 11 U.S.C. § 525(a) does not apply to the PPP, Tradeways cannot show that the SBA's IFR violates the Bankruptcy Code's antidiscrimination provision.

## IV.   Conclusion

The Court acknowledges plaintiff's understandable frustration and disappointment due to its inability to benefit from the PPP. But, for the reasons stated above, I must conclude that Tradeways cannot demonstrate a likelihood of success on the merits. Therefore, I shall deny plaintiff's Motion (ECF 2).

An Order follows, consistent with this Memorandum Opinion.


Date:   June 24, 2020                                  _____/s/_____
                                                       Ellen Lipton Hollander
                                                       United States District Judge

37